# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

SHARONDA L. JONES,  )
                                   )
        **Plaintiff,**         )
                                   )     **Civil Action No. 3:13-01204**
       **v.**                )     **Judge Trauger / Knowles**
                                   )
**CAROLYN W. COLVIN,**     )
**Acting Commissioner of Social Security,**     )
                                   )
        **Defendant.**      )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI"), as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 19. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 26. Plaintiff has filed a Reply. Docket No. 29.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed her application for Supplemental Security Income ("SSI") that is the subject

of the instant action on October 2, 2009, with a protective filing date of September 11, 2009, alleging that she had been disabled since January 1, 2004,[1] due to depression, asthma, high blood pressure, suicidal thoughts, and obesity. *See, e.g.,* Docket No. 13, Attachment ("TR"), pp. 63, 140-45, 197-204. Plaintiff's application was denied both initially (TR 63) and upon reconsideration (TR 64). Plaintiff subsequently requested (TR 89-91) and received (TR 37-60) a hearing. Plaintiff's hearing was conducted on April 26, 2012, by Administrative Law Judge ("ALJ") Renee Andrews-Turner. TR 37-60. Plaintiff and Vocational Expert ("VE"), Michelle McBroom-Weiss, appeared and testified. *Id.*

On May 24, 2012, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 11-36. Specifically, the ALJ made the following findings of fact:

1.  The claimant has not engaged in substantial gainful activity since the amended alleged onset date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: back disorder, osteoarthritis of the bilateral knees, asthma, obesity, hypertension, major depressive disorder, and history of polysubstance abuse (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After consideration of the entire record, the Administrative Law Judge finds that the claimant has the residual functional capacity to perform medium work as defined in

_____

[1] At her hearing, Plaintiff amended her alleged disability onset date to January 2, 2008. TR 41-42.

20 CFR 416.967(c) except that she can lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; with frequent ability to climb, balance, stoop, bend, crouch and crawl; and with an avoidance of concentrated exposure to fumes, odors, dust, poor ventilation and gases. She can carry out simple tasks; can maintain concentration, persistence and pace for at least two hours at a time in an eight-hour workday; can occasionally interact with the general public, co-workers and supervisors; and can adapt to frequent change in the workplace.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was 36 years old at the amended alleged onset date, which is defined as a younger individual (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416. 964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exists in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant's history of polysubstance abuse is not material to the issue of disability.

11.    The claimant has not been under a disability, as defined in the Social Security Act, since September 11, 2009, the date the application was filed (20 CFR 416.920(g)).

TR 16-29.

On July 26, 2012, Plaintiff timely filed a request for review of the hearing decision.  TR

7-10.  On August 31, 2013, the Appeals Council issued a letter declining to review the case (TR 1-5), thereby rendering the decision of the ALJ the final decision of the Commissioner.  This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).  If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive.  *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he

or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175,

1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by

relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the

---

[2] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ failed to: (1) properly consider the opinion of her treating mental health providers; (2) properly consider the opinion of the consultative examiner and "resolve significant inconsistencies between this opinion" and the ALJ's decision; (3) properly consider the limitations imposed by the side effects of her medications; and (4) "follow the proper procedure for evaluating substance use and improperly reducing [Plaintiff's] limitations due to her substance use without following the proper procedure for evaluating this evidence." Docket No. 19-1. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

7

The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

**1. Opinions of Plaintiff's Treating Mental Health Providers**

Plaintiff contends that, although the ALJ noted the evidence from Plaintiff's treating mental health providers in her decision, she "failed to mention SSR 06-3p and failed to evaluate these opinions or provide any explanation whatsoever regarding the regulatory factors for weighing such opinion evidence." Docket No. 19-1 at 13. Plaintiff further contends that "the ALJ misrepresented and/or misapplied the law as it applies to such opinions from 'other sources,' as she stated that these 'opinions must be considered, but [they] cannot be given preeminence over well-supported contrary opinions from acceptable medical sources.'" *Id.* at 14, *quoting* TR 22-23. Plaintiff argues that the ALJ's statement is contrary to SSR 06-03p. *Id.* at 13-16. Plaintiff maintains that the ALJ's decision is not supported by substantial evidence and therefore "must be reversed" because: (1) "the ALJ failed to properly evaluate these opinions in

her decision or provide sufficient explanation whatsoever regarding the weight given to these opinions or how they were accounted for in her decision, and she failed to mention or apply SSR 06-3p"; (2) "these are the sources who have seen and treated [Plaintiff] on numerous occasions throughout the period under review and are the most familiar with her mental impairments and resulting impairments"; and (3) these opinions were consistent with the opinion of the consultative examiner, which provides additional support for these opinions. *Id.* at 16.

Defendant responds that the ALJ properly considered the opinion evidence of record and provided valid reasons for the weight given to that evidence, and argues that those reasons are supported by substantial evidence, such that the ALJ's decision should be affirmed. Docket No. 26 at 5. Specifically, Defendant maintains that the ALJ explained that she accorded little weight to the opinions of Plaintiff's mental health treatment providers because: (1) as nurse practitioners and social workers, they are not acceptable medical sources qualified to offer medical opinions regarding Plaintiff's impairments; (2) the opinions lacked support in the treatment notes; (3) the opinions were internally inconsistent; and (4) the explanations provided by those providers did not necessarily support the level of limitation assessed. *Id.* at 6-10*, referencing* TR 22-23. Defendant further maintains that the ALJ explicitly cited SSR 06-03p in her decision, and that the ALJ's statement that opinions from medical sources that are not acceptable medical sources "must be considered, but [they] cannot be given preeminence over well-supported contrary opinions from acceptable medical sources, such as licensed physicians, psychiatrists, and psychologists" is consistent with SSR 06-3, which "clearly states that the fact that an opinion is from a source who is not an acceptable medical source is an appropriate factor to consider when weighing that source's opinion against one from an acceptable medical source." *Id.* at 11-12,

*referencing* TR 18, 22-23; SSR 06-3.

Plaintiff, in her Reply, argues that the ALJ's citation of SSR 06-3 "was merely a brief mention of the Ruling in the boilerplate language included in her decision," not a discussion of, or compliance with, the requirements of the Ruling.  Docket No. 29, at 1-2.  Plaintiff reiterates her contention that the ALJ "misrepresented and/or misapplied the law as it applies to such opinions from 'other sources,'" because the fact that SSR 06-3 states that "an opinion [] from a source who is not an acceptable medical source **is an appropriate factor to consider**" is "not the same thing as stating that the opinion 'cannot be give [*sic*] preeminence.'"  *Id.* at 2 (emphasis original).  Plaintiff further reiterates her contention that the ALJ failed to comply with SSR 06-3p in evaluating the opinion evidence of record and "rejecting this significant opinion evidence from Plaintiff's treating provider (non-acceptable medical source and/or non-medical source) without providing any sufficient basis for rejecting this assessment."  *Id.* at 3 (parenthetical original).  Plaintiff argues that her treating mental health providers "are the sources who have seen and treated [her] on numerous occasions throughout the period under review and are the most familiar with her mental impairments and resulting limitations," and that these providers have "offered opinions which support a finding of disability in her claim," such that the ALJ's improper evaluation of their opinions warrants remand or reversal.  *Id.*

As an initial matter, the opinions at issue were rendered by nurse practitioners and social workers who were Plaintiff's treating mental health providers at the Mental Health Cooperative ("MHC").  TR 597-1356, 1377-1416, 1463-1620.  While nurse practitioners and social workers are considered "other sources" who are not "acceptable medical sources" qualified to render medical opinions (*see* 20 CFR 416.927(c); SSR 06-03p), the ALJ must consider the evidence in

its entirety, and therefore should consider and use evidence from "other sources" to evaluate the severity of an impairment and how it affects a claimant's ability to work (*see* 20 CFR § 416.913(d); 20 CFR § 404.1513(d)). The ALJ in the case at bar discussed Plaintiff's treatment at the Mental Health Cooperative ("MHC") as follows:

> The evidence established that the claimant had been receiving mental health treatment with the Mental Health Cooperative since 1999. However, in June 2007, she admitted her mood was stable. She was sleeping okay and had a good appetite. Most of her problems seemed to revolve around conflicts with her boyfriend and children. It was noted that the claimant was on Federal probation for check fraud and her case had been transferred to the Mental Health Cooperative's FACT team because they could better handle her legal problems. Exhibit 23F.

> The claimant's new case manager met the claimant in the clinic in March 2008. Notes indicated that the claimant was there because her son had an appointment. She was well-groomed and appropriately dressed. She appeared to be in good physical health. Four days later, the claimant stated she had been taking medications regularly and had no concerns regarding her medications. The case manager transported the claimant to get drug screening, as notes indicated regular screening was required by the court. The claimant reported she had been sober for at least five years. In April 2008, the case manager met the claimant at home to transport her to Vocational Rehabilitation orientation at Park Center. The claimant was well-groomed and admitted she was in good physical health. She also reported she had been taking medication without any major problems. Urine drug screening was negative. The claimant later stated she was going to start work as a cook (with Voc Rehab). Additionally, she reported that she had gone "to the clubs" to celebrate her daughter's 21st birthday. She was getting along well with her children. Exhibit 23F.

> During a medication management appointment only one week later, she endorsed depression with crying spells and having a short temper with her children. However, she admitted that the stressors of "mental health court," making sure she took weekly drug screening, and changes in her case manager could be contributing to her mood. The claimant then reported she was

working as a cook and waitress at Park Center and had a roommate who was paying rent. The claimant said that she and her mother had been talking about starting their boarding home. The claimant was observed by her case manager as being active participant [*sic*] and making friends at Park Center.  Exhibit 23F.

She reported doing well in July 2008 and wanted to start looking for jobs as a cook or as part of the wait staff at a restaurant. Notes indicated that she then had been volunteering during the day. The claimant's biggest problem in October 2008 was dealing with her teenagers. She wanted to finish getting her GED and stated she would like to work as a CNT. Exhibit 23F.

The claimant reported a stable mood, with good sleep and appetite during a medication management appointment in January 2009. She denied paranoia, auditory/visual hallucinations, and alcohol/drug use, as well. Notes indicated she was appropriate with activities of daily living. She also stated that she had a job that would assist with her financial situation. Nevertheless, she was filing for "SSI." The claimant again reported doing well in February 2009, except for her new arrest for driving without a license. Exhibit 23F.

The claimant was out of medications in September 2009, yet reported a good mood, good sleep and good appetite. Even though she later reported frequent depression, poor concentration and memory, not being able to follow instructions, and isolating; she also later admitted she had she had gone with her mother to fill out a job application at Target. Later notes also indicated that the claimant did seem concerned that her 15 year-old son was missing, as she stated, "he has a lot of places to go." The case manager pointed out that she could lose her son's SSI check and since this was her only income, asked how she would cope without it. The claimant replied that a female friend had moved in and they were going to work together. Exhibit 23F.

It was telling that when the case manager met the claimant at home to transport her to her Social Security psychological evaluation, the case manager hardly recognized her.  The claimant's hair was sticking straight out, the hood of a sweatshirt was pulled over her head and she wore scruffy slippers.  The claimant stated she needed to look "mental" to get her Social Security.  However, she looked happy and laughed appropriately

at times. The claimant reported she had been denied disability in December 2009, stating, "I will have to tell them about the voices in my head next time." Nevertheless, her appearance was neat and clean; and, she showed no evidence of auditory/visual hallucinations, paranoia, or suicidal/homicidal ideation. The claimant was very proud of herself during a home visit four days before Christmas because she had gotten up at 2:30 a.m. to stand in line at the Last Minute Toy Store and had been able to get a tree and toys. Exhibit 23F.

The claimant reported compliance with medications without side effect during the medication management appointment in January 2010. She was sleeping and eating okay and again denied any psychotic symptoms. Notes also indicated she was trying to find work and had put out flyer in "the high rise to do cleaning for the elderly." The claimant laughed when she told her case manager she was going to celebrate Valentine's Day with her mother and daughter at a strip club. Interestingly, the case manager felt that the claimant would not get "SSI at this time." Exhibit 23F.

The claimant reported that her medications, without side effects, were working well in July 2010. However, the medical evidence indicated that the claimant continued to experience auditory hallucinations, but she stated she did not pay any attention to them. She admitted to using marijuana the week before, but denied any cocaine use for seven years. The claimant was seeing a new medication management physician, to whom she reported mood swings, crying spells without trigger, and irritability. Her auditory hallucinations were described as baseline. She was alert and oriented on all four spheres, while her affect was bright and her thoughts, linear. Exhibit 23F.

The clamant reported she had enjoyed her therapy session in September 2010 and felt comfortable with her provider. Notes throughout this month indicated that she was stressed over apparent denial of FEMA relief. However, she also indicated she was getting along betters with others, but limited her contact with them.

In December 2010, she presented as well-groomed and made good eye contact with the nurse, reporting medication compliance without side effects. However, her mood was

deemed flat and depressed. When the claimant presented to the physician, she made intermittent eye contact and was tearful. She endorsed crying spells, increased passive suicidal ideation, increased command auditory hallucinations of self-harm, and anhedonia. She did sleep and eat well, however. She wanted to move in with her daughter because she was lonely. Only one month later, there was no evidence of psychosis or psychomotor impairment, while the claimant admitted improvement in mood. She was experiencing increased daytime drowsiness as a side effect of medication. However, she stated this was manageable. In February 2011, the claimant reported no adverse reaction to medication. She was unsure of the content of her auditory hallucinations. Notes indicated that while she continued to endorse these hallucinations, they were notably improved. The claimant also admitted to improvement in mood stability in June 2011. However, she was uncertain as to how much medication she was taking or how often. Consequently, her medications were "bubblepacked." The claimant again reported that her mood was better the following month, with notable improvement in adherence with medications since "bubblepacking." She was sleeping six to eight hours per night. She denied any depressive symptoms, irritability or suicidal ideation. She again reported good mood in August 2011, except that she had been sick with asthma/bronchitis. Exhibit 27F.

During the September 2011 visit, the claimant was hoping to start a new job. She was enjoying her new eyeglasses, but was not wearing them because she was having difficulty getting adjusted to them. She stated she was doing better with current medications in October 2011 and requested refills. It was noted in November 2011 that the claimant had "declined groups" due to anxiety of being around others and lack trust [*sic*]. The claimant reported hearing voices, which were not bothersome in February 2012. She also admitted to improvement in mood with an increase in lithium, stating her suicidal ideation had resolved. She was very excited about starting a job a the zoo. She continued to be medication compliant and was sleeping well. She was alert and fully oriented, maintained good eye contact, had linear thought processes and ambulated with a normal gait. The case manager took the claimant to a restaurant to celebrate her new job. Exhibit 32F.

It should be noted that the claimant's case manager frequently

transported the claimant to several different charities in an attempt to seek financial assistance and often had to leave the claimant alone because it took so long. This is significant because the claimant apparently had no problem standing in line with several other people.

TR 19-21, *citing* TR 597-1356, 1377-1416, 1549-1620.

The ALJ also discussed the Global Assessment of Functioning scores and Clinically-Related Group summary assessments completed by Plaintiff's mental health providers at MHC, stating:

> Review of mental health records also indicated that the claimant's Global Assessment of Functioning (GAF) score during the applicable period was typically 45-50. The Diagnostic and Statistical Manual of Mental Disorders Fourth Edition (DSM-IV-TR) explains that GAF ratings in the range of 50 and below indicate at least "serious symptoms" of mental impairment that would typically preclude work. Contained in the records were clinically-related group (CRG) summary assessments. Narrative ratings in the CRGs are assigned in the following general functional areas: activities of daily (ADLs); interpersonal/social functioning; concentration, persistence and pace; and adaptation. These general areas are numerically rated as follows: 1- extreme symptoms/limitations; 2-marked symptoms/limitations; 3-moderate symptoms/limitations; 4-mild symptoms/limitations; and 5-no symptoms/limitations.
>
> In June 2008, the claimant was found moderately limited (3) in every functional realm, yet her GAF score was only 50. It was interesting that in part, notes stated that the claimant manipulate others, had boundary issues, and sometimes neglected household chores, but was getting better at money management. In March 2009, the claimant was found marked limited [*sic*] (2) in adaptation and social functioning and moderately limited (3) in CPP and ADLs, which equates with the GAF score of 45. However, the explanations for the marked limitations are questionable. In social functioning, it was simply noted that the claimant had problems controlling her children; while in adaptation, she simply relied upon the support of agencies. The GAF score of 45 in December 2009 was equally disputable as

she was found only moderately limited (3) in every functional realm. Explanation for these limitations were as follows: "can complete tasks on time; can sustain concentration for tasks when doing paperwork, but forgets appointments; asks for assistance when stressed; gave up car due to driving without a license; pays own bills; and reliant on child's SSI check." This is also the same month the claimant was proud of herself for standing in line at the Last Minute Toy store. The claimant was found markedly limited in all functional realms in September 2010. Although this also is consistent with a GAF score of only 40. This was during the same month she was having difficulty due to problems with getting approved for FEMA benefits, yet simultaneously admitted she was getting along better with others.

However, GAF ratings are not an assessment on the claimant's mental status and/or limitations on her mental status, they are used to track the clinical progress of an individual in global terms. (*See also,* DSM-IV).

TR 22.

With regard to the Medical Source Statement - Mental regarding Plaintiff completed by treating mental health provider Nurse Practitioner Alyn Taylor, the ALJ discussed this opinion as follows:

In addition to the CRGs, the file contained a March 2011 medical source statement from Alyn Taylor, one of the claimant's treating nurse practitioners. Mr. Taylor indicated that the claimant had moderate limitations in understanding, remembering, and carrying out simple instructions and in making judgments on simple work-related decisions. He said the claimant has marked limitations in understanding, remembering and carrying out complex instructions and in making judgments on complex-related decisions. In addition, Mr. Taylor stated the claimant has moderate limitations in interacting appropriately with co-workers, supervisors and the public; and marked limitations in adaptation. Mr. Taylor also indicated that these limitations had been ongoing since 1999. Exhibit 28F.

*Id.*, *citing* TR 1417-1419.

The ALJ continued:

> As a threshold matter, nurse practitioners, counselors and social workers are not "acceptable medical sources" under the Social Security Act for authoritative independent opinions relating to diagnoses and limitations. They are "other sources" whose opinions must be considered, but that cannot be given preeminence over well-supported contrary opinions from acceptable medical sources, such as licensed physicians, psychiatrists, and psychologists. 20 CFR 416.913.

> After reviewing the Mental Health Cooperative records, this evidence provided little if any, rationally discernible pattern or connection between the limitations assessed to the claimant, whether narratively or by GAF rating when compared to what the actual treatment notes said. Consequently, the opinion from nurse practitioner Taylor and the GAF assessments of 50 and below are accorded little weight.

TR 22-23.

As can be seen, contrary to Plaintiff's contention that the ALJ "failed to evaluate these opinions or provide any explanation whatsoever regarding the regulatory factors for weighing such opinion evidence," the ALJ thoroughly discussed Plaintiff's MHC records, including the GAF scores, CRG assessments, and Medical Source Statement - Mental opinions that are at issue. The ALJ was aware of Plaintiff's lengthy mental health treatment history at MHC and even explicitly noted that Plaintiff had been receiving treatment at MHC since 1999. TR 19. The ALJ recounted Plaintiff's treatment at MHC and considered the CRG assessment findings and GAF scores rendered by her treating mental health providers, but was not bound to accept them, as neither CRG assessments nor GAF scores are determinative of disability for Social Security purposes. *See, e.g., Oliver v. Commissioner,* 415 Fed. Appx. 681, 684 (6th Cir. 2011); *Kennedy v. Astrue*, 247 Fed. Appx. 761 (6th Cir. 2007); *Kornecky v. Commissioner*, 167 Fed.

Appx. 496, 511 (6th Cir. 2006); *Rutter v. Commissioner*, No. 95-1581, 1996 WL 397424 at *2 (6th Cir. July 15, 1996). Moreover, Plaintiff's contention that the ALJ discounted the opinions at issue because they were rendered by an "other source," is contrary to the ALJ's explicit rationale as expressed throughout her decision; namely, that there were inconsistencies between the opinions at issue, the treatment notes, Plaintiff's statements, the opinions of other professionals, and the record as a whole, such that the evidence did not support the level of limitations assessed. TR 14-24, 27-28. The ALJ is not bound to accept evidence that is contradictory to, or unsupported by, the evidence of record. When there are contradictory opinions in the record, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2).

As will be discussed in greater detail in the statements of error below, in addition to considering Plaintiff's MHC records, the ALJ also discussed the psychological evaluation performed by consultative examiner Alice K. Garland, M.S., and the Mental Residual Functional Capacity Assessments and Psychiatric Review Technique opinions of State agency psychological consultants Frank D. Kupstas, Ph.D., and Linda O'Neil, Ph.D. TR 23-24, 27, *referencing* TR 331-35, 351-54, 355-68, 1357-60, 1361-74. The ALJ further discussed, *inter alia*, Plaintiff's testimony, reported daily activities, subjective complaints, and reported medications (along with their efficacy and side effects), as well as the information she self-reported on her Function Reports. TR 17, 18-19, *referencing* TR 37-60, 212-19, 239-46, 597-1356, 1377-1416, 1549-1620.

After discussing the evidence in its entirety, the ALJ accorded the opinions at issue "little weight." TR 23. This determination was within her province. "[T]he determination of

disability must be made on the basis of the entire record and not on only some of the evidence to the exclusion of all other relevant evidence." *Hardaway v. Secretary*, 823 F.2d 922, 927 (6th Cir. 1987). The ALJ in the case at bar considered the evidence in its entirety, reached a reasoned decision, and explained the rationale for her decision; the ALJ's determination was supported by substantial evidence, and Plaintiff's contentions on this point fail.

With regard to Plaintiff's assertion that the ALJ "failed to mention SSR 06-03p," Plaintiff, in her Reply, acknowledges that the ALJ did explicitly mention SSR 06-03p, but maintains that she did so "merely [in] a brief mention ... in the boilerplate language included in her decision." Docket No. 29 at 1-2. While Plaintiff is correct that the ALJ explicitly noted SSR 06-03p on only one occasion in her decision, as discussed above, the ALJ's decision appropriately addressed the evidence and demonstrates that she fully considered the requisite factors. The fact that she did not specifically cite SSR 06-03p on multiple occasions does not warrant remand.

Plaintiff also contends that the ALJ "misrepresented and/or misapplied the law as it applies to such opinions from 'other sources,' as she stated that these 'opinions must be considered, but [they] cannot be given preeminence over well-supported contrary opinions from acceptable medical sources." Docket No. 19 at 14 (bracketing original). While Plaintiff, in her supporting Memorandum and in her Reply, quotes much of SSR 06-3p, Plaintiff's argument misses entirely the ALJ's stated qualifier of "*well-supported* contrary opinions." The ALJ did not, as Plaintiff's argument suggests, say that she could not accept the opinions at issue because they were rendered by "other sources" and opinions from "other sources" cannot be accorded greater weight than opinions rendered by "acceptable medical sources." Rather, the ALJ

explicitly acknowledged that opinions from "other sources" should be considered, but when those opinions contradict *well-supported* opinions from acceptable medical sources, the *well-supported* opinions from acceptable medical sources should be accorded greater weight. The ALJ's statement is proper and fully comports with the CFRs, SSRs, and Sixth Circuit case law. Plaintiff's argument on this point lacks merit.

## 2. Opinion of the Consultative Examiner

In her second statement of error, Plaintiff contends that the ALJ "failed to properly consider the opinion of the independent consultative examiner, and further failed to resolve significant inconsistencies between this opinion and her decision." Docket No. 19-1 at 1, 16-19. Plaintiff contends that, while the ALJ did accord "significant weight" to the consultative examiner's assessed moderate limitations, she erroneously accorded "little weight" to the consultative examiner's assessed marked limitations and she failed to provide valid reasons for so doing. *Id.* Plaintiff argues that the ALJ's proffered rationale is erroneous because: (1) "the evidence is contrary to the ALJ's assertion that [Plaintiff] did not have any significant problems with social functioning on an ongoing basis [because] the treatment notes show that she continued to have difficulties with being around people, she avoided certain situations because of her anxiety about others, and, in fact, she had both of her children removed from her home due to conflict and these difficulties"; and (2) "the evidence actually shows that [Plaintiff] has significant problems with adaptation ... [as] she needs case management to maintain stability, she requires assistance and prompts to complete tasks, and she is frustrated by changes." *Id.* at 17-18. Plaintiff notes that the activities she was performing "outside her home on a regular basis" related primarily to activities that she was being assisted with by her case manager. *Id.* at

18. Plaintiff contends that the evidence supports the consultative examiner's assessed marked limitations in public interaction and adaptive functioning, and that the ALJ's rejection of these opined limitations without providing a supported explanation for so doing was improper.

Plaintiff additionally contends that it was improper for the ALJ to rely upon the opinions of the reviewing, non-examining State agency physicians over those of the consultative examiner because more weight should be accorded to the opinion of an examining source than to a non-examining source and because the ALJ's stated rationale was conclusory and lacked explanation. *Id.* at 19. Plaintiff argues that the ALJ should have accepted the consultative examiner's opinion over those of the State agency physicians' because the consultative examiner actually saw Plaintiff, and because her opinion that Plaintiff had marked limitations in public interaction and adaptive functioning is consistent with the opinions from her MHC treating mental health providers. *Id.* Plaintiff notes that the VE testified that an individual who could not adapt to infrequent changes would not be able to perform any work in the regional or national economy. *Id.* Plaintiff contends, therefore, that the ALJ's failure to accept the consultative examiner's opined marked limitations in public interaction and adaptive functioning warrants reversal and a finding of disability. *Id.*

Defendant responds that the ALJ appropriately accorded little weight to those aspects of the consultative examiner's opinion that were inconsistent with the evidence, and properly explained her rationale for so doing. Docket No. 26 at 12-13. Defendant contends that, contrary to Plaintiff's assertion that the ALJ's proffered reasons were conclusory, the ALJ properly supported her stated reasons with numerous examples of supporting evidence throughout her decision. *Id., referencing* TR 17-21, 27. Defendant states:

> Plaintiff objects to the ALJ's reasons for discounting Dr.
> Garland's assessment of marked limitations (Pl.'s Br. 18).
> However, Plaintiff fails to address the evidence cited by the ALJ
> in support of her findings. Instead, Plaintiff essentially asks the
> Court to reweigh the evidence of record by giving more or less
> weight to certain evidence than the ALJ did. This line of
> argument is foreclosed by the applicable standard of review. See,
> e.g., Myers, 471 F.2d 1265, 1266-67 (6th Cir. 1972).

*Id.* at 13.

Plaintiff, in her Reply, argues that Defendant is impermissibly attempting to "supplement the ALJ's conclusory basis for rejecting psychological examiner Alice Garland's opinions and provide rationale for this rejection despite the ALJ's failure to do so." Docket No. 29 at 3. Plaintiff reiterates her contention that the ALJ's "conclusory reasons are erroneous and contrary to the evidence," such that "her reason for rejecting this assessment is erroneous." *Id.* at 4. Plaintiff additionally reiterates her contentions that: (1) the ALJ erroneously relied upon the opinions of the reviewing, non-examining State agency physicians over those of the consultative examiner; and (2) the consultive examiner's opinion is consistent with, and supported by, the opinions of Plaintiff's treating mental health providers, which all support a finding of disability, such that the "ALJ's findings are erroneous, without merit, and lack the support of substantial evidence." *Id.* at 5.

On November 20, 2009, consultative examiner Alice K. Garland, M.S., performed a psychological evaluation of Plaintiff. TR 331-35. The ALJ discussed this evaluation as follows:

> Alice K. Garland, M.S., performed a psychological evaluation of
> the claimant in November 2009. The claimant was transported to
> the interview by her case manager and presented with an
> appropriate appearance. She ambulated slowly and sat slumped.
> She also often sat with a hood over her hair. She initially stated

she had been depressed for approximately six to seven years, then said she was probably depressed as a child. Her symptoms also included mood swings, crying spells (all the time), inability to sleep without sleeping pills, loss of interest, worthlessness and hopelessness. She stayed in the house a lot and might eat if stressed out. She reported being the victim of rape at age 11. She dropped out of school in the tenth grade because she had children. She had few friends, bu no behavior problems while in school. She had never married and had four children, all by different men. She admitted she started using marijuana and cocaine approximately six and one-half years prior to the interview, but "quit herself and rehabbed to get clean." She had been receiving mental health treatment for approximately six years and had been hospitalized for depression several years ago. She currently lived with a cousin, who was her best friend. Exhibit 17F.

Regarding activities of daily living, she might do housework once every two weeks, mostly microwaves food, might eat breakfast, watched television, or might sit and cry. She went to the store with her mother because she tended to by [*sic*] junk food. She went to bed around 10:00 p.m., but might stay up until 5:00 a.m. She was always up by 8:00 or 8:30 a.m. Her mother did the laundry. She had never learned how to laundry [*sic*]. She used to love to cook but had lost interest, did not attend church or go out to eat. She said she tried to stay at home because she might "go off" for no reason and had too much on her mind to remember things. She was described as being "self-focused." When asked what her biggest problem was, she responded "since her children had gotten older and was being alone." The claimant was oriented, but gave the date as the 21st when it was the 20th. She was responsive to questions only. Her affect was blunted and she seemed sad and tired. She was tearful "some." Exhibit 17F.

On testing, the claimant recalled two of three objects after a five-minute delay, named two recent U.S. presidents, knew the colors of the American Flag and the shape of a basketball. She misspelled the work "world" backward, did not know a recent news event, and could not calculate serial 3's or 7's. However, her thought process was deemed organized and there was no indication of a thought disorder. She was felt functioning in the borderline to low average range of intelligence. Exhibit 17F.

Dr. Garland determined the claimant might have mild limitation in the ability to do complex and detailed work; appeared to be moderately limited in the ability to persist and concentrate; and appeared to be moderately to markedly limited in the ability to work with the public. Her adaptation ability also appeared to fall between moderately and markedly limited.

Nevertheless, it was interesting that the examiner reviewed mental health notes of September 2009, which indicated the claimant was laughing, with the claimant reporting that she was able to handle her situation as God was taking care of her. Yet, she was very tearful and lethargic. Consequently, the examiner requested updated mental health records and objective third party reports. Exhibit 17F.

. . .

Examining psychologist Garland opined that the claimant might be moderately to marked [*sic*] limited in her ability to interact with the public and in her ability to adapt. However, this examiner noted discrepancies in the claimant's current presentation and mental health treatment notes. Consequently, this opinion is given significant weight regarding the moderate limitations Ms. Garland assessed the claimant with, but little weight is given to her assessment that the claimant may have marked limitations in adaptation and interaction with the public. Specifically, the evidence demonstrated that the claimant has continued to interact with others without any significant problems on an ongoing basis. Also, the record revealed that the claimant was out doing activities outside her home on a regular basis, which demonstrated that the claimant did not have any significant problems adapting to changes in her life.

TR. 23-24, 27.

As can be seen here and in the previous statement of error, the ALJ comprehensively recounted Dr. Garland's evaluation and Plaintiff's mental health treatment records, including the CRG assessments, GAF scores, and Medical Source Statement - Mental completed by her treating mental health providers. The ALJ also discussed Plaintiff's testimony and Function

Report answers in relevant part as follows:

> The claimant testified that she cannot work because she has
> asthma, bronchitis, high blood pressure, high cholesterol, arthritis
> in the back and knees, and depression. . . . She used to pull out
> her hair and hit herself in the face with the car door when
> stressed. Her medication has been changed to lithium and it has
> helped a whole lot. This medication causes her to be tired a lot
> and she wants to sleep all the time. She talks to people, but not
> much, but some days does not want to see anyone, wants to stay
> home, does not like change, and does not like to grocery shop.
> She said that she could not remember stuff. . . .
>
> The claimant reported rather benign daily activities in the
> function reports at exhibits 10E and 14E, such as taking a bath,
> taking medicine, lying back down, eating or drinking a protein
> shake, watching television, and/or going to appointments. She
> cared for her teenage son and needed no help to do so. She had
> no problems caring for her personal needs, but sometimes stayed
> in her pajamas for two weeks due to depression. She also
> indicated (both) that she had no problems bathing and might go
> two weeks without bathing. She needed reminders to take
> medication to go to appointments [*sic*]. She no longer attended
> church. She listed her hobbies as watching television, doing
> things with her children, spending time with her mother, writing,
> lying in bed and talking to the people in her head. She was able
> to pay bills and count change, but did not know how to write
> checks or handle a savings account. She had difficulty following
> instructions, did not finish what she started, did not handle
> stress/change well, and had been fired for snapping at a
> customer/losing her temper.

TR 18-19, *citing* TR 212-19, 239-46.

In addition to discussing the evidence recounted above, the ALJ also explained:

> . . . [M]ental health records indicated that the claimant was
> manipulative. This was evidenced by the fact that she was
> typically well-dressed and well-groomed, yet when she prepared
> to go to the psychological evaluation, her hair was unkempt, she
> had a hood pulled over her head, and wore scruffy slippers,
> stating that she had to look "mental" to get her SSI.
> Additionally, when denied disability benefits, she stated that the

next time, she would have to tell them about the voices in her head.  Although the claimant then began reporting auditory hallucinations, they were consistently described as baseline.  Even then, she was fully alert and had linear thoughts.  The claimant also participated actively and made friends when she worked at [*sic*] a cook/waitress at Vocational Rehabilitation.  The claimant also testified that lithium was helpful in relieving her symptoms.  Finally, none of her impairments prevented her from going to different clubs, including a strip club. . . . Thus, there is simply no evidence to support the extreme limitations of her testimony. . . .

TR 27-28.

Plaintiff's contention that the ALJ's stated rationale was conclusory, erroneous, and unsupported by the record is, itself, unsupported by the ALJ's discussion of the evidence.  *See* TR 17-24, 27-28.  The ALJ's discussion clearly sets forth her reasons for making the findings and determinations she rendered; those reasons were based on, and supported by, the evidence of record; and the ALJ's discounting Dr. Garland's opined limitations in public interaction and adaptive functioning was proper.  Plaintiff's contention on this point fails.

With regard to Plaintiff's contention that the ALJ erroneously accepted the opinions of the reviewing, non-examining State agency physicians over those of Ms. Garland, after comprehensively discussing the evidence set forth above, the ALJ stated: "Significant weight is also accorded to the opinions of State agency psychological consultants, Frank D. Kupstas, Ph.D., and Linda O'Neil, Ph.D., who reviewed the evidence and concluded the claimant has mild to moderate limitations in functioning because these opinions are consistent with the claimant mental health treatment history when viewed in its entirety."  TR 27.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

Regardless of its source, we will *evaluate every medical opinion* we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we *consider all of the following factors* in deciding the weight we give to any medical opinion.

(1) *Examining relationship.*  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship*.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is *well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...

(3) *Supportability*.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

(4) *Consistency*.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

. . .

20 CFR § 416.927(d) (emphasis added).  *See also* 20 CFR § 404.1527(d).

The ALJ must articulate the reasons underlying his decision to give a medical opinion a specific amount of weight.[3]  *See, e.g.,* 20 CFR § 404.1527(d); *Allen v. Commissioner*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004).  The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the medical opinion and the reasons for that weight.  SSR 96-2p.

As can be seen, the Regulations provide that the ALJ is to evaluate *every* medical opinion in the record, and, unless giving a treating physician's opinion controlling weight, must consider *all* of the listed factors when deciding the weight to accord medical opinions. 20 CFR § 416.927(d); 20 CFR § 404.1527(d). While Plaintiff is correct that more weight is generally accorded to the opinion of an examining source than to that of a non-examining source, examination is simply one factor, among several, including examining relationship, treatment relationship, supportability, consistency, and specialization, to be considered.  *Id.*  The ALJ is not required to give controlling weight to a physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 416.927(d)(2) and

---

[3] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 C.F.R. §1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record.  *See, e.g., Friend v. Commissioner*, 375 Fed. Appx. 543, 551 (6th Cir. April 28, 2010); *Nelson v. Commissioner*, 195 Fed. Appx. 462, 470-72 (6th Cir. 2006); *Hall v. Commissioner*, 148 Fed. Appx. 456, 464 (6th Cir. 2006).

20 C.F.R. § 404.1527(d)(2).  Instead, when there is contradictory evidence, the physician's

opinion is weighed against the contradictory evidence under the criteria listed above.  *Id.*

When opinions are inconsistent with each other, the final decision regarding the weight to be

given to the differing opinions lies with the Commissioner.  20 C.F.R. § 416.927(e)(2).

The ALJ was aware of the evidence in the record, comprehensively discussed it, properly

evaluated it, reached a supported decision, and demonstrated the rationale for that decision.  It is

clear from the ALJ's detailed articulated rationale that, although there is evidence which could

support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with

Plaintiff's allegations.  This is within the ALJ's province.

The ALJ explained that she accorded significant weight to the opinions of the State

agency psychological consultants because those opinions were consistent with Plaintiff's

mental health treatment history when viewed in its entirety; and, as noted, consistency and

supportability are two appropriate factors to be considered when weighing the evidence.  The

ALJ's acceptance of the State agency psychological consultants' opinions was proper;

Plaintiff's contention on this point also fails.

### 3.  Medication Side Effects

In Plaintiff's third statement of error, Plaintiff contends that the ALJ "failed to properly

consider the limitations imposed by the negative side effects of [her] medications, as required

by SSR 96-7p and SSR 96-8p."  Docket No. 19-1 at 20.  Specifically, Plaintiff argues that the

record documents her "reports of over-sedation and sleeping all the time due to side effects of

her medications," and she contends that the side effects from her medications would "likely"

affect her ability to sustain concentration, carry out instructions, and/or perform sustained work

activity for eight hours a day.  *Id.*  She contends that the ALJ failed to discuss these side effects or consider their impact upon her ability to work when forming her residual functional capacity assessment, as required.  *Id.*

Defendant responds that the ALJ "explicitly discussed Plaintiff's reported side effects (and absence thereof)," and adds that, "as the ALJ noted, a review of the record shows that Plaintiff generally denied medication side effects."  Docket No. 26 at 14.  Defendant also responds that Plaintiff "relies entirely on her subjective complaints to establish that she suffers from disabling side effects," but the ALJ "properly found that Plaintiff's statements were not entirely credible" and was "therefore not required to adopt Plaintiff's statements."  *Id.*

Plaintiff, in her Reply, reiterates her contention that the ALJ failed to discuss her reports of "over-sedation and sleeping all the time due to side effects of her medication" and failed to consider how these side effects would affect her ability to work when determining Plaintiff's residual functional capacity.  Docket No. 29 at 5-6.

As can be seen in the quoted passages from the ALJ's decision set forth in the previous statements of error, the ALJ explicitly and repeatedly recounted Plaintiff's reported medication side effects and, generally, the lack thereof.  *See supra*; TR 17-28.  The ALJ specifically acknowledged Plaintiff's report of fatigue and "wanting to sleep all the time," but also discussed Plaintiff's numerous reports of sleeping well and taking her medication without side effects.  Plaintiff's assertion on this point is contrary to the ALJ's explicit discussion; Plaintiff's argument here fails.

### 4.  Substance Use

In her final statement of error, Plaintiff argues:

> The ALJ found in her decision that [Plaintiff's] severe impairments included "history of polysubstance abuse." TR 16. However, the ALJ failed to properly consider or evaluate the evidence regarding this history of substance abuse in her decision, and, in fact, she improperly reduced the limitations in her residual functional capacity (RFC) finding based upon this history of substance use without following the proper procedure for evaluation of this evidence. Moreover, the ALJ failed to first determine whether [Plaintiff's] impairments, including her substance use, were disabling prior to determining whether any substance use was material to her disability. See Tr. 27.

Docket No. 19-1 at 21.

Plaintiff maintains that the ALJ "jumped to a discussion and finding that the Plaintiff's conditions were substance abuse-induced without first determining whether her major depressive disorder and bipolar disorder were disabling with any substance use." *Id.* at 23. Plaintiff argues that the ALJ failed to follow the proper procedure for evaluating substance use because: (1) "she reduced her RFC finding to only moderate limitations based on her (erroneous) conclusion that these were her limitations in the absence of substance use"; and (2) "the ALJ also erroneously determined that polysubstance use was not material to the issue of disability, as the ALJ is only supposed to make such a determination after it is determined that the claimant is disabled with consideration of such substance use." *Id., citing* TR 27. Plaintiff contends that the record shows that her treating physicians and providers had determined that her conditions and limitations existed without any substance abuse involved, and that, even during periods of remission (including some extended periods), she continued to experience significant symptoms, and continued to be assessed with serious limitations due to her mental impairments. *Id.* at 23-24.

Defendant responds that Plaintiff's argument "fails because it is based on a faulty

premise." Docket No. 26 at 15. Defendant asserts that SSR 13-2p applies "only where the ALJ seeks to justify denying disability based on a finding that Plaintiff was suffering from DAA [Drug Addiction and Alcoholism]." *Id., citing Sullinger v. Astrue*, No. 12-231-GFVT, 2014 WL 1331163, at *4 (E.D. Ky. Mar. 31, 2014). Defendant maintains that the ALJ in the instant action "cited evidence throughout the record showing that Plaintiff was not disabled, regardless of whether Plaintiff's substance use was considered." *Id.* Defendant notes that, although the ALJ noted that Plaintiff had a history of substance abuse, the ALJ never concluded that Plaintiff was addicted to drugs, and that absent such a finding SSR 13-2p is inapplicable. *Id., citing Sullinger*, *supra*.

Plaintiff, in her Reply, reiterates her arguments on this point. Docket No. 29 at 6-7. Plaintiff also notes that Defendant failed to "address the fact that the ALJ used her perceived materiality of [Plaintiff's] substance use to decrease the limitations in her RFC finding, thereby failing to follow proper procedure for evaluating drug and alcohol abuse." *Id.* at 6.

As an initial matter, the undersigned notes that SSR 13-2p took effect on March 22, 2013, and was therefore not in effect on May 24, 2012, when the ALJ rendered her decision. *See* SSR 13-2p. Accordingly, the ALJ could not have followed the procedure set forth in SSR 13-2p, and SSR 13-2p is inapposite to the case at bar. At the time in question, the relevant SSR was SSR 82-60 (*see* SSR 13-2p, 2013 WL 621536), which provides in pertinent part as follows:

> **PURPOSE**: To clarify the basic policy to be applied in the evaluation of title II and title XVI disability claims where drug addiction or alcoholism is present.
>
> . . .

**POLICY STATEMENT**: The definition of disability is the same under title II and title XVI. Also, the principles underlying the adjudication of disability claims from drug addicts or alcoholics are the same as those underlying the adjudication of claims from other any individual. Any determination that an individual meets the definition of disability must be based on sufficiently detailed medical evidence describing the severity of the impairment and, when appropriate, on other information such as the individual's vocational history. The medical evidence must describe an impairment which results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. Furthermore, the impairment must be established by medical evidence consisting of symptoms, signs, and pertinent clinical and laboratory findings, not only by the individual's allegations or statement of symptoms. Finally, impairments must be of sufficient severity to meet or equal a listed impairment in Appendix 1 of Subpart P of Regulations No. 4 (incorporated by reference for title XVI in section 416.925) or, considering appropriate vocational factors, to prevent the individual from performing past relevant work or any other work.

*2 Drug addicts or alcoholics cannot be considered "disabled" on the basis of that diagnosis alone; on the other hand, a diagnosis of drug addiction or alcoholism should not have an effect on a disability evaluation that is adverse to the applicant. Drug addicts and alcoholics are subject to all the ills that may affect any other applicant. Drug addiction and alcoholism are diagnostic terms; they do not denote impairment value or severity. It is necessary to evaluate the severity of the impairment which may be associated with, manifested by, result from, or coexist with these diagnoses.

It must be recognized also that the issue of whether the individual has lost the ability to control the use of drugs or alcohol affects the matter of diagnosis. The loss of ability to control these substances identifies the individual as a drug addict or alcoholic diagnostically, but does not provide a conclusive basis for evaluating the severity of the impairment.

. . .

Ultimately, the decision will depend upon the severity of the impairment, as properly documented by the required medical

findings, and, for appropriate cases, the limitation of function imposed on the applicant by the impairment in conjunction with applicable vocational factors. An individual may be a drug addict or an alcoholic and not be disabled if the evidence fails to show inability to engage in substantial gainful activity.

The basic medical evaluation criteria are found in the Listing of Impairments (Appendix 1 to Regulations No. 4, Subpart P, and incorporated by reference in section 416.925 of Regulations No. 16, Subpart I). The introduction to the mental impairment listing, section 12.00, provides a comprehensive summary of the basic evaluation principles to be applied to cases involving mental disorders, including those where drug addiction or alcoholism is present. Drug addiction and alcoholism are found under functional nonpsychotic disorders, listing 12.04. Section 12.04 was received in 1974 for title XVI (Supplemental Security Income) cases and in 1975 for title II cases to clarify the evaluation concept to be applied in mental cases involving drug addicts or alcoholics. . . . As in all disability cases, the impairment must be assessed in view of the individual's total medical condition and its effect on his or her ability to function.

*3 Adequate information must be obtained to permit proper evaluation of the individual's impairment(s). It is very important that relevant medical evidence--including history, physical examination, and pertinent laboratory data--be secured from treatment sources. If sufficient evidence for a decision is not available from these sources, an additional medical examination is required. It may be necessary for this examination to be performed by an internist, neurologist, psychiatrist, or other medical specialist, depending on the type of impairment(s) in question and the evidence which is needed.

The medical evidence is then evaluated to determine whether the individual's impairment, or impairments in combination, is of a level of severity and of expected duration to meet, or to be medically equivalent to, the Listing of Impairments. If any of these medical evaluation criteria are met or equaled, the individual is found to be disabled. If they are not, and the individual has a severe impairment, the impact of the impairment on his or her ability to work must be considered in terms of vocational factors such as age, education and prior work experience. Then, the decision as to disability is made.

Under both title II and title XVI, a claimant whose disability has been established must follow the treatment prescribed by a treating physician if the treatment could restore the ability to work. In addition, an individual whose disability has been established cannot refuse to accept vocational rehabilitation services without a good reason. Under title XVI, special conditions are required of individuals who are found disabled and for whom drug addiction or alcoholism is a contributing factor material to the finding of disability. These individuals are required (1) to undergo treatment appropriate to the condition of drug addiction or alcoholism at an approved institution or facility, when that treatment is available, and (2) to receive benefit payments through a representative payee. The chief purpose of the treatment and representative payee provisions for drug addicts and alcoholics under title XVI is to rehabilitate the individual to enable him or her to become a productive member of society and, thus, to remove the individual from the disability rolls.

Section 416.935 of the title XVI (Supplemental Security Income) regulations provide that an individual will be medically determined to be a drug addict or alcoholic only if he or she is under a disability (as defined in regulations section 416.905) and drug addiction or alcoholism is material to the finding of disability. The policy set forth in the regulations was developed following extensive consultations with other concerned Government agencies (e.g., the Alcohol, Drug Abuse and Mental Health Organizations, and the Special Action Office for Drug Abuse Prevention). A critical issue in applying the medically determined drug addiction or alcoholism provision under title XVI (i.e., undergoing appropriate, available treatment and receiving payments through a representative payee) is that the provisions are not applied until the adjudication of the claim results in a decision of disability. These special title XVI provisions only establish additional requirements after the individual is found disabled; they do not establish a different basis for evaluating disability for individuals who are drug addicts or alcoholics.

*4 Where the definition of disability is met in a title XVI claim, and there is evidence of drug addiction or alcoholism, a determination must also be made as to whether the drug addiction or alcoholism was a factor material to the finding of disability for purposes of applying the treatment and

representative payee provisions. In making this decision the key issue is whether the individual would continue to meet the definition of disability even if drug and/or alcohol use were to stop. If he or she would still meet the definition, drug addiction or alcoholism is not material to the finding of disability and the treatment and representative payee provisions do not apply. The drug addiction and alcoholism requirements are imposed only where (1) the individual's impairment(s) is found disabling and drug addiction and/or alcoholism is a contributing factor material to the determination of disability, and (2) the same impairment(s) would no longer be found disabling if the individual's drug addiction or alcoholism were eliminated as, for example, through rehabilitation treatment.

SSR 82-60, 1982 WL 31383 at *1-4.

20 CFR § 416.935, entitled, "How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability," was also in effect at the time of the ALJ's decision and provides:

(a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability, unless we find that you are eligible for benefits because of your age or blindness.

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

(1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 CFR § 416.935.

With regard to the ALJ's discussion of Plaintiff's drug use, the ALJ found a "history of polysubstance abuse" to be one of Plaintiff's severe impairments at step two of the sequential evaluation process (TR 16), but ultimately determined that it did not rise to a listing level severity (TR 17). When recounting Plaintiff's testimony, the ALJ reported that Plaintiff had testified that she had last used drugs one month before the hearing and was going to "sign up for rehab." TR 18. When discussing Plaintiff's treatment records from MHC, the ALJ noted that: (1) in March 2008, Plaintiff's case manager transported her to get her court ordered regular drug screening, and that at that time, Plaintiff reported that she had been sober for at least five years (TR 19); (2) in April 2008, Plaintiff's urine drug screening was negative; (3) in January 2009, Plaintiff denied alcohol/drug use; and (4) in July 2010, Plaintiff admitted to using marijuana "the week before," but denied any cocaine use for seven years. TR 19-21. When discussing Ms. Garland's November 2009, consultative examination, the ALJ noted Plaintiff's report that she admitted that she had started using marijuana and cocaine approximately six and one-half years prior to the interview, but "quit herself and rehabbed to get clean." TR 23. When discussing Plaintiff's medical treatment, the ALJ noted that in June 2011, Plaintiff presented with ten episodes of vomiting when she stated that she had taken an

Ecstacy pill given to her by "a friends [*sic*]." TR 26. After discussing Plaintiff's medical

records in their entirety, the ALJ stated:

> Medical records indicated that the claimant has a history of
> polysubstance abuse. The medical evidence pointed out that
> when the claimant has been in remission from polysubstance use,
> she has been assessed with having moderate limitations in her
> mental ability to concentrate, interact with coworkers, and adapt
> to changes in the workplace. Exhibit 17F. Therefore, the
> claimant's history of polysubstance use is not material to the
> issue of disability.

TR 27. *See also* TR 29.

First, as can be seen, the ALJ discussed Plaintiff's reported history of polysubstance

abuse, but never found that Plaintiff was addicted to drugs or that Plaintiff's drug use was

severe enough to meet or equal a listing. In fact, the ALJ explicitly stated: "The severity of the

claimant's mental impairments, considered singly and in combination, also do not meet or

medically equal the criteria of listings *12.04*, 12.08, and 12.09, as "paragraph B" criteria are not

satisfied." TR 17 (emphasis added). As discussed above, SSR 82-60 states:

> The basic medical evaluation criteria are found in the Listing of
> Impairments (Appendix 1 to Regulations No. 4, Subpart P, and
> incorporated by reference in section 416.925 of Regulations No.
> 16, Subpart I). The introduction to the mental impairment listing,
> section 12.00, provides a comprehensive summary of the basic
> evaluation principles to be applied to cases involving mental
> disorders, including those where drug addiction or alcoholism is
> present. *Drug addiction and alcoholism are found under
> functional nonpsychotic disorders, listing 12.04.* Section 12.04
> was received in 1974 for title XVI (Supplemental Security
> Income) cases and in 1975 for title II cases to clarify the
> evaluation concept to be applied in mental cases involving drug
> addicts or alcoholics. . . . As in all disability cases, the
> impairment must be assessed in view of the individual's total
> medical condition and its effect on his or her ability to function.

SSR 82-60, 1982 WL 31383 at *2.

Contrary to Plaintiff's assertion that the ALJ "failed to properly consider or evaluate the evidence regarding this history of substance abuse in her decision," the ALJ's decision clearly demonstrates that she was aware of Plaintiff's reported history of polysubstance abuse, she considered it, and she ultimately determined that it was not of listing level severity. Supported by the evidence of record, the ALJ's determination was proper.

Second, although Plaintiff contends that the ALJ found that Plaintiff's "conditions were substance abuse-induced," there is nothing in the ALJ's discussion to support this assertion. The ALJ simply did not opine that Plaintiff's "conditions were substance abuse-induced."

Third, although Plaintiff contends that the ALJ "reduced her RFC finding to only moderate limitations based on her (erroneous) conclusion these were her limitations in the absence of substance use," and that she "used her perceived materiality of [Plaintiff's] substance use to decrease the limitations in her RFC finding," the ALJ made the following RFC determination:

> 4.    After consideration of the entire record, the Administrative Law Judge finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except that she can lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; with frequent ability to climb, balance, stoop, bend, crouch and crawl; and with an avoidance of concentrated exposure to fumes, odors, dust, poor ventilation and gases. She can carry out simple tasks; can maintain concentration, persistence and pace for at least two hours at a time in an eight-hour workday; can occasionally interact with the general public, co-workers and supervisors; and can adapt to frequent change in the

39

workplace.

TR 17-18.

As can be seen, there is nothing in the ALJ's RFC finding that supports Plaintiff's

assertion. While the ALJ did later recount Ms. Garland's consultative examination, stating:

"The medical evidence pointed out that when the claimant has been in remission from

polysubstance use, she has been assessed with having moderate limitations in her mental ability

to concentrate, interact with coworkers, and adapt to changes in the workplace" (TR 27, *citing*

TR 331-35), the ALJ was simply recalling Ms. Garland's opinion. There is nothing in the

ALJ's RFC determination or explanation therefore to support that she either "reduced her RFC

finding to only moderate limitations based on her (erroneous) conclusion these were her

limitations in the absence of substance use," or that she "used her perceived materiality of

[Plaintiff's] substance use to decrease the limitations in her RFC finding."

As has been demonstrated, the ALJ complied with the law as it stood at the time she

rendered her decision. The ALJ's evaluation of the evidence was proper. The ALJ's

determination that Plaintiff was not under a disability within the meaning of the Social Security

Act at any time through the date of her decision was supported by substantial evidence.

Plaintiff's arguments fail.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for

Judgment on the Administrative Record (Docket No. 19) be DENIED, and that the decision of

the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14)

days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge